William E. Geiler, J.
This is an action for a permanent injunction to restrain the defendant Town of Huntington from. removing or demolishing an air-supported pool dome on plaintiff’s property and from revoking a building permit issued on February 29, 1968 authorizing construction of this dome.
Plaintiff also seeks to recover approximately $2,500 for damages allegedly caused to the dome by the employees of the Town of Huntington and approximately $100,000 for loss of profits allegedly sustained because of the action of the Town of Huntington.
Plaintiff, since 1964, has been the owner of a parcel" of land, approximately 300 feet by 300 feet, situated 471.25 feet from the southeast corner of Larkfield Eoad and Clay Pitts Eoad in the Town of Huntington. The subject parcel is adjacent to a gasoline service station, which is on the corner of Larkfield Eoad and Clay Pitts Eoad and is in a general area comprising varied commercial enterprises.
The first 150 feet, in depth, of plaintiff’s property is zoned “ General Business ”.
*1053 Plaintiff’s predecessor in title, Drabor Enterprises, approximately seven years ago, applied to the Zoning Board of Appeals of the Town of Huntington and requested an extension of the business depth of the subject parcel for an additional 150 feet and also requested permission to operate a large swimming pool and related recreational facilities. The board handed down the following decision on March 28, 1960:
“ On Application of Drabor Enterprises, 260 East Jericho Turnpike, Huntington Station, New York, for permission to extend depth of Business use and operate a place of amusement, property located in General Business and Res. B-l zones át the east side of Larkfield Road 175 feet south of Clay Pitts Road, East Northport, New York.
‘ ‘ Application granted with the following provisions:
“1. No organized activity to which the general public will be invited is permitted.
“ 2. Applicant must provide and maintain on-site parking for all members at all times. At no time will parking on the public roads be permitted.
“ 3. The pool and any area of recreation in the area beyond 150 feet from Larkfield Road must be closed off at or before 9 E.M.
‘ ‘ 4. All lights must be extinguished in the rear or pool area at or before 9 p.m., and the lights must at all times be shielded from the residences.
‘ ‘ 5. The club building must be built entirely within the 150 feet area.
“ 6. A buffer zone between the residential area and the parking space must be established and shall be at least 20 feet wide along the easterly line of the property, and this buffer zone must have a fence to the extreme east in front of which there must be landscaping containing plants and evergreens.
“ 7. Subject to the approval of all regulatory bodies having jurisdiction.”
Shortly thereafter, Drabor Enterprises erected, on the premises herein, a large outdoor swimming pool, cabanas, and a large clubhouse building within which there is a restaurant and bar. The clubhouse is located on the first 150 feet of the property.
The plaintiff, just as its predecessor, has operated this recreational complex on a membership basis and the swimming pool has been open from Memorial Day to Labor Day each year.
During the spring and summer of 1967, plaintiff investigated the possibility of erecting a plastic air-supported dome over the swimming pool so that it might be used on a year-round basis. *1054 The investigation not only proved the feasibility of this idea, but also the great need for such a facility in the area.
Birdair Structures, Inc., after careful inquiry, was engaged by the plaintiff to draw up plans for the air-supported dome.
Shortly thereafter, plaintiff met with a town councilman and the Building Inspector of the Town of Huntington. They suggested that plaintiff make a presentation of his plans to the members of the Town Board. This was done and the Town Board advised plaintiff to submit plans to the Engineering Department. Plans were submitted to the Engineering Department and numerous conferences were had with that department and with the Building Inspector. Many changes, necessitating greater expense to the plaintiff, were made at the request of the Engineering Department and Building Inspector.
Plaintiff, on January 8, 1968, after having worked out all of the preliminary details with the Engineering and Building Departments, and having signed a contract with Birdair and having arranged the necessary financing with a banking institution, applied to the Building Department for a permit. Representatives of the Building Department, for the first time, and with full knowledge of plaintiff’s previous activities, told plaintiff that it would have to obtain a resolution from the Town Board, in compliance with subdivision H of article 1 section 4 of the Town Building Code, before a permit would be issued.
The application was finally heard, although plaintiff requested an earlier date, at a regular meeting of the Town Board on February 13, 1968. Plaintiff was advised, again for the first time, that the board had not yet checked the “ legality ” of the proposed structure. The board, however, agreed to issue a temporary permit, pending a review of the applicable law, provided plaintiff would execute an agreement affording the Town of Huntington the right to revoke the permit and remove the dome at any time after March 20,1968. Such an agreement was executed on February 27,1968 and on the same day, plaintiff was issued a building permit.
Soon thereafter, the dome was erected at a cost of approximately $47,000. Plaintiff, in order to utilize the accessory facilities in conjunction with the covered pool, made an application for and was granted a separate building permit to enlarge and heat the adjacent cabanas at an additional cost to the plaintiff of approximately $20,000.
The Town Board refused to extend plaintiff’s permit with reference to the dome and on March 19, 1968 a Town Board resolution was adopted directing the removal of the dome by 5:00 p.m. on March 20,1968. The dome was not removed by the *1055 deadline contained in the resolution; and defendant on the morning of March 21, 1968 commenced such removal but was enjoined by a temporary restraining order served on it later that day.
Justice Stanislaw, of this court, in a learned opinion (56 Misc 2d 715) granted plaintiff a temporary injunction and held that the agreement executed by the parties was valid only if the erection of the dome is illegal under any existing ordinances. This decision was unanimously affirmed by the Appellate Division of the Second Department (30 A D 2d 541).
Therefore, the issue to be decided by this court is whether the erection of the dome violates any existing ordinances.
Does the dome violate the March 28, 1960 grant of the Zoning Board of Appeals?
Defendant urges that the location of the dome, within 100 feet of residential property, violates the grant of March 28, 1960 and therefore the dome is illegal.
The only restriction enumerated by the Zoning Board of Appeals with reference to location of buildings in its decision of March 28,1960 is number 5 mentioned above.
What did the board mean by this restriction ? Did they require that no type of building could be erected within 100 feet of the rear boundary line?
The board clearly indicated that the club building, within which the restaurant and bar were to be located, was to be built entirely within the first 150 feet of the property which was always zoned for business use.
The board, as evidenced by the other restrictions mentioned in its decision above, wanted to separate the swimming activity which had to close by 9:00 p.m. from the restaurant and bar which could remain open much later.
This interpretation of the Zoning Board restriction has been followed by the town itself. The town authorized the construction of the cabanas in the rear 150-foot area where the pool was constructed and recently issued another permit for their enlargement.
The requirement that the ‘ ‘ club building ’ ’ be erected within the front 150 feet of the property does not prohibit erection of other structures on the rear 150 feet of the property.
Otherwise, how could a purchaser of property which was the subject of a variance ever be protected if he could not rely upon a decision of a Zoning Board? Does the town seriously believe that no purchaser of property would be safe unless he looked further to the record before the Zoning Board and read each piece of correspondence sent to the Zoning Board?
*1056 The assertion by the defendant, that the erection of the dome violated certain self-imposed restrictions mentioned by the representatives of Drabor Enterprises at the time of the hearing before the Zoning Board, is untenable. These “alleged restrictions ” are not mentioned in the grant of March 28, 1960.
Conditions imposed by a zoning board must be expressed with sufficient clarity to inform an applicant of the limitations on the use of his land and cannot incorporate by reference statements of the applicant at the hearing (Anderson, Zoning Law and Practice in New York State, § 18:46; Matter of Rochester Historical Soc. v. Crowley, 14 A D 2d 490; Matter of Conmar Bldrs. v. Board of Appeals, 43 Misc 2d 577).
The decision of the Zoning Board is clear and no amount of rationalization or wishful thinking by defendant can change that decision. The town, just like the plaintiff, no matter how distasteful, must comply with the clear terms of the written decision.
Was plaintiff required, as directed by the representatives of the Building Department on January 8, 1968, to apply to the Town Board for a resolution pursuant to subdivision H of section 4 of article 1 of the Huntington Building Code ?
The purpose of this provision of the Huntington Building Code is undisputed. It was enacted so that certain defense industries could erect a ‘ ‘ temporary ’ ’ type of air-supported structure which would be taken down at the conclusion of a fixed period of time.
It is clear that plaintiff did not intend to spend $47,000 to erect a temporary structure which would only be used for a limited period of time. There is no doubt that this plastic dome is a permanent structure, just as permanent as storms and screens, erected for one season and removed for another.
Thus, this section of the Huntington Building Code was not applicable to plaintiff at all.
Furthermore, this provision was no longer in effect on January 8, 1968, the time when plaintiff first applied for a building permit. Both parties now agree that this provision, like all others which are not purely administrative, was repealed when the State Building Code was adopted by the Town of Huntington on September 1,1967.
Is the erection of the plastic dome violative of the provisions of the State Building Code?
The witnesses oh behalf of the defendant urge that the State Building Code has “ no applicability to plaintiff’s dome.” This conclusion is based upon the following definitions of building *1057 and structure as contained in the State Building Code (9 NYCRR 803.3):
‘1 Building. A structure wholly or partially enclosed within exterior walls, or within exterior and party walls, and a roof, affording shelter to persons, animals, or property.”
“ Structure. An assembly of materials, forming a construction framed of component structural parts for occupancy or use, including buildings.”
The witnesses on behalf of the town somehow conclude that an air-supported shelter, like the subject dome, is not framed of component parts and thus the State Code is not applicable.
What in effect is the town saying! The court, if the town’s interpretation is correct, can only come to the conclusion that the “ dome ” is nothing more than a “ nonstructure ”, something in the nature of a flag pole, that requires no permit for its erection. Certainly, the town cannot demand removal of a non-structure which is admittedly not a hazard or danger to anyone.
Does the State Code prohibit the erection of a nonstructure!
A careful reading of the State Code indicates that there is no provision or language which prohibits the erection of a non-structure. Thus, if defendant’s interpretation is correct, plaintiff does not even need a permit to erect this dome.
The court would be remiss if it went no further and let the matter rest with defendant’s interpretation of the State Code. It would condone an interpretation of the State Code which is clearly contra to the public policy of this State as evidenced by the following language contained in section 370 of the Executive Law:
‘ ‘ Construction costs for buildings of all types have for decades been excessive and have risen to unprecedented levels. Many persons in the state are unable to obtain decent and sanitary housing at prices or rentals which they can afford. Other persons, and commerce and industry generally, are affected by excessive costs in the construction of non-residential buildings. Such conditions are contrary to the public interest, and threaten the health, safety, welfare, comfort and security of the people of the state. These conditions are emergent and critical. Their continuance is intolerable.
“ Among the factors inducing high costs of construction are various laws, ordinances, rules, regulations and codes regulating the construction of buildings and the use of materials therein. Many such requirements are obsolete and unnecessarily complex. They serve to increase cost, without providing correlative benefits or safety to owners, builders, tenants and users of buildings. It is the purpose of this act to institute the preparation of *1058 a state code of building construction to provide, so far as may be practicable, basic and uniform performance standards. Thus, while establishing reasonable safeguards for the security, welfare and safety of the occupants and users of buildings, the use of modern, methods, devices, materials and techniques will be encouraged. This should be effective in lowering construction costs.
“ Because it is essential that any such code be readily adaptable to changing conditions, detailed enactment of all of the provisions of such a code by legislation is impracticable.”
Thus, it is clear that the State Building Code was enacted so that new and ingenious methods of construction, such as the subject dome, could be taken advantage of by the citizens of this State. The only requirement for acceptability of these new methods of construction is adequate performance, as indicated in the following provision of the State Code (9 NYCRR 800.2): * ‘ purpose. The purpose of this code is to provide basic and uniform regulations in terms of performance objectives, establishing reasonable safeguards for the safety, health, and welfare of the occupants and users of buildings and their accessory structures, and making adequate performance the test of acceptability.”
The evidence introduced in the record clearly indicates that the subject dome complies in all respects with the performance standards contained in the State Building Code.
The court therefore agrees with the plaintiff that the more logical approach, one which complies with the purpose for which the State Code was enacted, is to state that the dome is a structure composed of component parts which are supported by air pressure and that the State Code is applicable. Further, that the sole test of acceptability under the State Code is adequate performance.
This is the view the defendant town must take if it wishes to intelligently meet the construction problems of the 20th century. It must not give an interpretation to the State Code which will defeat the very purpose for which it was enacted.
Equally as important, the defendant town should not declare something illegal which is merely unpopular with a certain segment of the electorate. Nor should it attempt to take away vested rights by agreement under conditions no court would sanction.
The defendant must use its awesome power not only to prohibit the maintenance of that which is illegal but also protect the right to construct that which is legal no matter how distasteful it may be.
*1059 The court therefore grants plaintiff the permanent injunction prayed for. Furthermore, the plaintiff, when construction is completed, is entitled to a certificate of occupancy.
The court now turns to the question of damages.
The town urges that the plaintiff was required to file a notice of claim as a condition precedent to instituting an action for damages. It cites section 50-e of the General Municipal Law.
It is well settled that in an equity action for injunctive relief no such notice is required to recover monetary damages (Fontana v. Town of Hempstead, 18 A D 2d 1084, affd. 13 N Y 2d 1134; Grant v. Town of Kirkland, 10 A D 2d 474 ; Jayne v. East Hills Water Dist., 6 Misc 2d 676).
The court finds from the credible evidence in the record that the plaintiff failed to sustain its burden of proof with reference to damages for loss of revenue. A claim for damages based upon sheer speculation cannot be sustained (Frenchman & Sweet v. Philco Discount Corp., 21 A D 2d 180).
The court further finds that plaintiff has failed to prove that any of the alleged “physical” damage to its premises Avas caused by defendant except Avith respect to the door.
The plaintiff is entitled to the sum of $50 for the repair of the door.