WILLIAM HOLMES et al., Appellants, v PLANNING BOARD OF
THE TOWN OF NEW CASTLE, Respondent.

Second Department, November 17, 1980

2

APPEARANCES OF COUNSEL

*Shamberg Bender & Marwell, P. C. (Stuart R. Shamberg* and *Robert F. Davis* of counsel), for appellants.

*Lawrence Dittelman* for respondent.

OPINION OF THE COURT

TITONE, J.

On appeal this court must determine the reasonableness of a condition which was imposed by the Planning Board of the Town of New Castle as a requisite of its approval of the site plan submitted by the petitioners. The condition is based on a limited goal plan, entitled the King Street Hill Area Site Plan. The plan is circumscribed in scope and area. Its goal is to provide a partial solution to the problem of traffic congestion on a small section of King Street, the main east-west artery of the Town of New Castle. This goal is to be achieved by using interconnected parking lots and common access drives as the relief mechanisms.

Since the condition is based on a plan, and has no meaning without reference to the plan, the reasonableness of the condition cannot be ascertained without correspondingly considering the reasonableness of the plan. Reasonableness in the context of this appeal requires a determination that neither the plan nor the condition is arbitrary, confiscatory, or discriminatory. The application of these tests has been complicated by the formless and ambivalent nature of what has been adopted by the board as a plan.

The King Street Hill Area Site Plan is in reality nothing more than a concept, a brilliant concept given the problem it was designed to cure, but a concept nonetheless. As such,

the plan is presently being implemented by the imposition of conditions, without full consideration of its final form and effects upon full execution, or the strategies necessary to achieve full execution.

Since the condition requires the petitioners to participate in an amorphous plan, the final over-all effects of the condition on petitioners' property cannot be determined by this court from the record as now constituted. In effect, we are limited to considering the reasonableness of the condition based solely upon the concept and to this extent I find that the condition is constitutionally valid. But this finding does not fully resolve the issues presented on this appeal. In my opinion, the matter must be remitted to the planning board for the articulation of an implementation plan so that the petitioners may discover the full extent of the participation required from them and the benefits and burdens they will incur under the plan.

A thorough recitation of the facts is necessary in order for one to understand the concept as presented and its unacknowledged limitations.

### THE PROBLEM

The petitioners' property is located on the north side of King Street in the Chappaqua business district of the Town of New Castle. The area was originally residential and, unfortunately, the present physical infrastructure of the district reflects the former low intensity use. Most businesses are conducted in what were once private homes. Clients and patrons of the businesses and professional offices park their cars within lots confined by property lines or adjacent to the premises. To reach these lots, they must use the same driveways which formerly serviced the residences.

As noted, the petitioners' property fronts on the north side of King Street, the most heavily trafficked east-west artery in the Chappaqua hamlet. The property is situated just below the main business district intersection of King Street and North Greeley Avenue, and directly opposite the intersection of King Street and Senter Street. Although King Street is part of the State highway system, the grade and horizontal curvature of the road unfortunately exceeds the maximum standards for such factors. These design de-

fects have greatly diminished the capacity of the road to handle the large volumes of traffic generated by the change in use. Its capacity has been further decreased by the frequent and closely spaced intersections and the placement of awkward driveways. Thus, New Castle suffers severe traffic congestion and a high accident rate in the area in which the petitioners' property is located. The problem has been intensified by the rapid growth experienced in the area. As of 1977, 10 new buildings had been constructed in the preceding 6 years. This construction has added 22 stores and 15 offices to the business district.

Town authorities and the general public have been aware of this problem for a substantial period of time. Both the 1968 Town Comprehensive Plan and the 1969 Chappaqua Business District Plan highlighted the area for remedial action. Since the identification of the problem, certain mechanisms have been employed to obtain better flow and increased safety for vehicular and pedestrian traffic. For example, on-street parking has been banned along sections of the south side of King Street. The major approach, however, has involved the minimization of driveway curb cuts opening onto King Street. This objective has been achieved by means of site plan review. Site plans, submitted by the individual property owners, have been approved only if the traffic generated by the proposed use of the property could be accommodated by existing drives.

In addition, the planning board attempted to condition its approval of certain applications on the elimination of individual drives in situations where one curb cut was capable of servicing adjacent properties owned by a single developer.[1] These devices, however, proved insufficient to achieve the stated goals and thus the board continued to seek better approaches to the problem of increasing congestion.

In 1975 Dr. Brosgol, owner of property adjacent to that of petitioners, applied for site plan approval of certain alterations which would increase the office space in his existing structure. The Brosgol application provided the board with an opportunity to effect a new solution for the elimina-

---

1. A driveway on another property owned by the petitioners and adjacent to the premises herein, was eliminated by the board in this manner in 1971.

tion of driveway curb cuts. The proposal suggested by the town's planning consultant (hereinafter referred to as the consultant), required that the parking lots owned by Dr. Brosgol and the petitioners be interconnected and that a common access drive be utilized to service both properties.

However, the board felt the need for more concrete guidance before effecting the proposal. Accordingly, it commissioned a study to develop a co-ordinated solution for traffic circulation, access and parking problems. In response, the consultant prepared a sketch analysis or policy mapping of the planning relationships among the properties on the north side of King Street (which included the properties of petitioners and Dr. Brosgol) in an "end state" format, that is, a postexecution viewpoint.

For the purposes of this appeal, I have included a less detailed[2] rendering of this sketch. The planning relationships have not been changed and are portayed as submitted. However, the rendering encompasses properties adjacent to the borders of the plan to illustrate our lack of comprehension concerning some of the unarticulated assumptions underlying the planning relationships.

*Sketch appears on page 6.*

---

2. The original mapping included a drainage concept which is not relevant to this appeal and has been omitted. Also deleted are topographical details, landscaping features, immaterial property lines, and municipal service buildings descriptions.

main access points; also labeled as common access, dual driveways; description of the device not provided.

parking lot connection points between which will run an unmapped easement; manner of maintenance not contemplated; dimensions unknown.

existing driveways and curb cuts.

present and apparently projected development (the maps contained in the record do not correlate as to the level of development presently existing on the properties encompassed by the plan); actual use and traffic generation potential unspecified.

unexplained symbols.

plan border.

property and street lines.

parking area; plan participants' rights to utilize parking facilities on adjacent properties undefined.

A     Petitioners' property encompassed by plan.

A+     Petitioners' adjacent property, upon which driveway has been eliminated.

B     Dr. Brosgol's property.

C     unencompassed property with driveway servicing C+.

D     last property on King Street with driveway curb cut on King Street before the Maple Street intersection which marks the mid point on the King Street "S" curve.

In an accompanying memorandum, the consultant informed the board that "[t]he key to the implementation of such a scheme will be the Planning Board's insistence upon the development of parking area * * * connections between adjoining properties as a condition of site plan approval and the retention of jurisdiction to require the elimination of access drives to King Street at such time as the development of the cross connections eliminates the necessity for retaining them." After the concept had been articulated in this limited manner, the board evaluated Dr. Brosgol's proposal using the study as a standard.

At first Dr. Brosgol protested the imposition of the

"driveway easement" condition. He was under the erroneous impression that the board was requiring him to acquire an easement over the petitioners' property and was therefore in negotiation with the petitioners. His protest was based on his fear that his bargaining position would be endangered by the public formulation of the condition. The board chairman explained that the board was requesting an easement from Dr. Brosgol which would only take effect when the petitioners granted a corresponding easement to Dr. Brosgol. Thus, Dr. Brosgol's negotiations were unnecessary. The connection would occur only when the board decided to effect the plan. All that was presently required was Dr. Brosgol's consent. Approval of his application was granted subject to the following conditions relevant to this appeal:

"2. That the applicant grant an easement to the owner of the adjoining property fronting on King Street lying to the southwest providing for a parking lot connection between the two parcels, such easement to be effective upon the granting of a reciprocal easement by the adjoining property owner.

"3. That the applicant will permit the consolidation of his existing driveway on King Street with the driveway of the adjoining property fronting on King Street to the southwest at such time as the Planning Board shall request it."

No attempts to isolate potential conflicts or develop specific plan elements had been made when the petitioners first approached the board on December 7, 1976. The petitioners were seeking the board's approval of a proposed addition to an existing office building on their property.

When informed that the overriding consideration in evaluating their proposed site plan was the minimization of curb cuts into King Street, petitioners protested that they were being penalized, and argued that since Dr. Brosgol had no parking area,[3] "combining the driveways"

---

**3.** At the first hearing concerning the Brosgol site plan which generated the planning study, it was noted that Dr. Brosgol had eight parking spaces and planned to create four more. The consultant suggested that the arrangement of the lot be changed to plan for a circulation aisle at a future date. The record provides no indication of the actual number of spaces contained on the Brosgol property.

would permit his visitors to use the petitioners' parking facilities. The board chairman reiterated the position that only one curb cut should service both properties and requested that the petitioners "work out a plan with Dr. Brosgol which would be acceptable to the Planning Board."

On December 21, 1976 the petitioners returned to the board and reported that they had made an offer to Dr. Brosgol which the latter refused. The petitioners raised another objection to the easement concept. Noting that Dr. Brosgol's back property was as yet unimproved, the petitioners argued that the board was requiring them to grant an easement, despite the fact that they had no knowledge of the type of development which would occur or how much use it would generate. The board chairman replied that "it was quite legitimate to request an easement for access to and from the Brosgol property provided that any parking spaces utilized for such access be provided for on the Brosgol property." [4] On January 18, 1977 further discussion followed without resolution of the conflicting positions, concerning the proposed "dual driveway with the Brosgol property and an easement from Holmes and Kennedy to the rear portion of the Brosgol property." [5]

On March 1, 1977 the petitioners again reported that the negotiations with Dr. Brosgol had failed and requested that their site plan be approved as submitted. They argued that the board was without authority to disapprove their proposal. The deputy town attorney replied that the board had statutory authority to require "reciprocal easements for ingress and egress over the driveways of the subject parcel and the adjacent property". The board chairman stated that the board would not impose a condition at this time, but would rather receive a proposal by the applicants. Approval of the site plan as submitted was denied by unanimous vote of the board.

The petitioners then sought judicial review to challenge

---

4. It should be noted that the consultant's concept contained no policy concerning the loss of spaces on one property and corresponding use of spaces on another's property, or the easement requirement's interaction with regulations concerning parking space/floor space ratios.

5. As noted, the common access concept has not been defined.

the board's determination. Special Term noted that the concept submitted by the planning consultant had not been formally adopted by the board, and remanded the matter to that body because it had failed to make findings of fact to support its denial. Special Term also expressed an awareness of the "divergence of opinion as to the meaning of the restrictive easement condition" and held that "its vagueness constitutes a fatal defect."

On remand the board held a series of public hearings concerning the adoption of the study (upon which no further work had been done) and the conditional approval of the petitioners' site plan. Memoranda in support of the consultant's concept were submitted to the board. Of particular importance was the fact that the New York State Department of Transportation agreed with the "concept" as a whole. That agency stressed that the existing driveways were designed for limited vehicular generation and were inadequate for their new use in servicing offices and small retail developments, given existing access conditions. The town engineer noted that prior devices employed had reduced but not eliminated the congestion problem and recommended that approval of the petitioners' site plan be conditioned on their consent to a cross connection with the Brosgol parking area and consent to a common access drive from King Street for both properties. The planning consultant opined that absent the reconstruction and relocation of the entire highway, the only reasonable and practical solution to the problems of congestion and vehicular and pedestrian safety would be the requirement of cross connections between adjacent parking areas and the use of predetermined combined access points to the public road.

Only the petitioners were in opposition. They contended that the plan would allow the public use of the easement and would deny the petitioners control over their parking lot. The town attorney responded that easements or reciprocal easements were not being requested. "Rather, property owners would be required to consent to cross-connections with adjacent properties and use of common access drives at such time as the Planning Board may determine at a future date."

On October 4, 1977 the board adopted the concept proposed by the consultant in its original amorphous form as a guide for future harmonious development of the properties encompassed, subject to future amendment as may be deemed necessary. It was entitled the "King Street Hill Area Site Plan." The board also approved the petitioners' site plan subject to, *inter alia*, the following condition: "In conformance with the King Street Hill Area Site Plan, applicants shall file with the Secretary to the Planning Board a written document, in form satisfactory to the Town Attorney, consenting to a cross-connection between their property and adjacent lands to the East, allowing parking area traffic flow between such properties and use of a common access driveway (s) to King Street, at such time as the Planning Board determines that the actual physical implementation of the plan is appropriate."

The petitioners then brought the instant proceeding to review and annul the resolution of the planning board conditioning approval of their site plan. In dismissing petitioners' application, Special Term found that the board was authorized to condition site plan approval on the petitioners' agreement to participate in the King Street Hill Area Site Plan, that both the condition and plan had a reasonable relationship to the community's welfare and that both were supported by substantial evidence.

On appeal the petitioners argue that the condition is unreasonable in that it is arbitrary and confiscatory. (Petitioners make no reference to it being discriminatory.) They challenge the authority of the planning board to impose conditions, contend that traffic congestion is not a legitimate concern of the board, and assert that the means used to solve the problems is not properly related to the application before the board. Above all they contend that the condition effects a "taking" of their property rights. I will first discuss the issue of alleged arbitrariness.

### THE SOLUTION AS ARBITRARY

The petitioners correctly state that the planning board has no authority to impose conditions on its approval of the petitioners' site plan under the delegation of authority

contained in section 276 of the Town Law. Under the cited section, the board has no right to evaluate site plans at all, since it is concerned with subdivisions only. *(Nemeroff Realty Corp. v Kerr*, 38 AD2d 437, 441, affd 32 NY2d 873; *Matter of Thurman v Snowden*, 28 AD2d 705; *Matter of Cedar Lane Hgts. Corp. v Marotta*, 17 AD2d 651.) Historically, and prior to the enactment of section 274-a of the Town Law, discussed below, lack of authority for planning board review of site plans under section 276 of the Town Law posed significant problems for those local governments which desired a co-ordinated planning approach for developmental permit applications. Highly creative solutions were implemented to circumvent the lack of statutory authorization. Some towns merely defined and impermissibly subdivided plats to include site plans (see *Matter of Stateline Plaza v Lehrecke*, 87 Misc 2d 234). Others provided power mandates in their local ordinances which were also unauthorized (see *Matter of Stato v Squicciarini*, 59 AD2d 718).

The definitive solution was supplied by the Legislature, however, with the enactment of section 274-a of the Town Law in 1976 (L 1976, ch 272). This section provided towns with the option of delegating to their planning boards the power to approve site plans and special permits. With respect to site plan review, the power to condition is not explicitly set forth in the statute. Nevertheless, given the planning board's power to deny the application outright, it would seem logically to follow that a planning board may validly impose reasonable conditions on the approval of a site plan, both as an accommodation to the applicant and to further the health, safety and general welfare of the community (see 2 Rathkopf, Law of Zoning and Planning [4th ed], § 30.04, p 30-21, n 23; cf. *Church v Town of Islip*, 8 NY2d 254, 259).

The Town of New Castle has elected to delegate the responsibility for site plan review to its planning board (Code of Town of New Castle [hereafter Town Code], § 60-441). Concomitantly it has specifically conferred upon such board the power to attach conditions to its approval of a site plan application as in conformance with its review

standards (Town Code, § 60-444). There is no doubt, therefore, that the board was authorized to approve the petitioners' site plan conditionally.

The petitioners, however, question the board's underlying concern with traffic congestion. They assert that it is more properly the business of the police department. Such argument is specious. It is beyond question in this State that traffic congestion is related to public health, safety and welfare *(Matter of Overhill Bldg. Co. v Delany*, 28 NY2d 449, 457; *Matter of Westchester Reform Temple v Brown*, 22 NY2d 488, 496). Not only is traffic congestion a proper subject for concern, it is also a mandated subject of the board's consideration. Under the specific authority delegated to the planning board, each application must be evaluated to determine "that pedestrian and vehicular access, traffic circulation and the general layout of the site is properly planned with regard to the safety of cars and pedestrians using the site, as well as those on neighboring properties and streets" (Town Code, § 60-444). The board has attempted to uphold the standards by imposing a condition with the limited goal of eliminating curb cuts in order to reduce congestion and increase safety on the road. Such action by the board is well within the parameters of the authority delegated to it by the town.

New Castle has also empowered its planning board to develop specific or general plans employing the standards promulgated in the local code for any area in which development is expected (Town Code, § 60-446). It is under this authority that the King Street Hill Area Site Plan was developed and adopted.[6]

The solution proposed in the concept is not new. Many municipalities have attempted to utilize this technique to counteract the bad effects on traffic congestion of uncon-

---

6. The fact that the plan was adopted after the petitioners' application does not invalidate the plan. An application is measured by current planning standards and under these standards formalized adoption of a limited goal plan is not important, especially where the goal of the plan has been previously announced in an adopted comprehensive plan. (See *Matter of Neiderhofer v Gustafson*, 45 AD2d 812, 813; *Matter of Town of Bedford v Village of Mount Kisco*, 33 NY2d 178.) Moreover an estoppel argument is not appropriate on the facts of this case. (See *Matter of Pokoik v Silsdorf*, 40 NY2d 769.)

trolled strip development. In *Nelson v Mundt* (32 AD2d 951, affd 27 NY2d 515), the Town Board of the Town of Clarkstown, Rockland County passed an ordinance in 1967 which required that shopping center parking lots be maintained so that adjacent boundaries were free and traffic flow between lots was unimpeded. The ordinance was declared to be unconstitutional on the ground that the Legislature had not delegated such authority to the town. In this instance, New Castle acts under no such infirmity by virtue of the enactment by the State Legislature of section 274-a of the Town Law.

Since the decision in *Nelson v Mundt (supra)*, understanding of the art of planning and appreciation of its value have grown. The town has delegated the necessary authority to the planning board pursuant to State statute. Nevertheless, the board exercise of that authority in preparing and adopting a plan and in imposing a condition based on it, must withstand judicial scrutiny. (See *Marcus Assoc. v Town of Huntington*, 45 NY2d 501, 505.) The exercise of power in the preparation and adoption of a limited goal plan must likewise be examined in order to ascertain whether it is consistent with the comprehensive plan *(Udell v Haas*, 21 NY2d 463, 469) and compatible with regional and State planning goals *(Berenson v Town of New Castle*, 38 NY2d 102). On the evidence presented herein, these elements have been met.

It should also be mentioned that accompanying the change in attitude towards planning has been a greater acceptance of the devices utilized by planners to effect their goals. Conditions imposed as an incident of approval in a developmental permit control system are a major weapon in a planner's arsenal. Conditions allow flexibility and fairness in land use and development control decisions, and provide the ability to deal with problems such as traffic congestion, something barely contemplated under zoning schemes (see Fonoroff & Terrill, Controlling Traffic Through Zoning, 21 Syr L Rev 857).

The most common utilizations of conditions in land use and development decisions occur in nondiscretionary determinations which are made subject to conditions publicly

specified in advance, e.g., special permits, or discretionary determinations subject to stipulated conditions, e.g., variances or site plan approval (Freilich & Quinn, Effectiveness of Flexible and Conditional Zoning Techniques—What They Can and What They Can Not Do For Our Cities, 1979 Institute on Planning, Zoning and Eminent Domain, 167, 193).

In New York, the use of reasonable conditions as a land control device has been long upheld (see *Matter of Reed v Board of Standards & Appeals of City of N.Y.*, 255 NY 126). In the landmark case of *Church v Town of Islip* (8 NY2d 254, *supra*), the Court of Appeals upheld the imposition of reasonable conditions upon the grant of a rezoning in the face of a "contract zoning" accusation.

The petitioners claim on this appeal, however, that the condition imposed on them is unreasonable because it is arbitrary. In framing the issue of arbitrariness, there are certain specific formulations of the test or elements thereof which petitioners assert cannot be met. Namely they argue that the condition must be stricken because it is not "directly related to and incidental to the proposed use" of their property (see *Bernstein v Board of Appeals of Vil. of Matinecock*, 60 Misc 2d 470, 474; *Matter of Conmar Bldrs. v Board of Appeals of Inc. Vil. of Upper Brookville*, 43 Misc 2d 577).

The test is derived from the fundamental rule regarding the exercise of police power, i.e., "that there is some evil extant or reasonably to be apprehended which the police power may be invoked to prevent and that the remedy proposed must be generally adapted to that purpose" [7] *(Salamar Bldrs. Corp. v Tuttle*, 29 NY2d 221, 226; accord *French Investing Co. v City of New York*, 39 NY2d 587, 596, app dsmd and cert den 429 US 990).

The petitioners have mistaken the meaning of the term "use". It refers to the zoning use of the property and is relevant only in the context of applications dealing with such use. It is used to defeat conditions primarily concerned

---

7. The petitioners do not argue that the plan is not a reasonable means to achieve the goals set for King Street.

with the owner or occupant of the land (see *Matter of Dexter v Town Bd. of Town of Gates,* 36 NY2d 102, 105), with the details of the proposed use (see *Town of Huntington v Sudano,* 42 AD2d 791, 792; *Matter of Schlosser v Michaelis,* 18 AD2d 940), or with the enforcement of regulations promulgated by State agencies (see *Bernstein v Board of Appeals of Vil. of Matinecock, supra*).

In practice, courts have applied this rule to applications concerning development as well as to zoning "use". The confusion occurs because the ordinary use application generally involves some development. However, in the context of this appeal, the specific formulation of petitioners is inapposite. The condition imposed herein relates solely to the proposed addition to the existing structure and does not even incidentally concern the zoning use of the existing structure as an office building. Thus the condition must be judged by standards more appropriate to development.

Such standards have been formulated in context of applications for the development of subdivision plats. They are standards related to growth and as such must be applied here. In associating subdivision plats with site plans, I do not deny the significant differences between them. "A site plan usually evidences the proposed development of a single lot, whether for one principal building and permitted accessory buildings, or for a group of buildings * * * intended to remain in one ownership. A subdivision plat contemplates division of one tract into a number of smaller lots with eventual separate ownership of each such lot." (2 Rathkopf, Law of Zoning and Planning [4th ed], § 30.04, p 30-13.) Nevertheless, although site plans may encompass 20-acre industrial centers while subdivision plats may include two ¼-acre single family homes, the differences in eventual ownership do not impede the use of similar tests for approval of either a site plan or subdivision application. These tests focus on the relationship of the growth potential of the property to its external environment (contra Rathkopf, *ibid.*).

The petitioners themselves make this analogy and assert a test generally used to measure the dedication conditions required for subdivision plat approval. They contend that

no condition may be imposed which alleviates public needs other than those which are "uniquely and specifically attributable" to the development proposed in their application. This test was first enunciated in *Pioneer Trust & Sav. Bank v Village of Mount Prospect* (22 Ill 2d 375), and again articulated in *Krughoff v City of Naperville* (68 Ill 2d 352). Its corollary, that the benefit deriving from a condition must accrue to the development rather than the public as a whole *(Aunt Hack Ridge Estates v Planning Comm. of Town of Danbury*, 27 Conn S 74; *Cimarron Corp. v Board of County Comrs. of County of El Paso*, 193 Col 164; *Stroud v City of Aspen*, 188 Col 1), helps to focus the principle justifying the rule. That principle, basically a tax rule, is referred to as the "Special Assessment Doctrine".

Under this doctrine, a contribution of park lands, for example, required from the subdivider by the municipality as a condition of its approval of the application, is justified by the particular public benefit which is received by the subdivision as a whole. Thus, the need alleviated must be created solely by the application and the benefit derived must accrue solely to the assessed property. In order to find a specific and unique relationship between the benefit and the assessed property, there must be spatial proximity between the improvement and the property, a correlation between the cost and the provable benefit, and an improvement capable of being exactly financed or proportioned, e.g., sewers, streets and parks (see Costonis, Development Rights Transfer: An Exploratory Essay, 83 Yale LJ 75, 110).

These criteria posed great difficulties for municipal authorities confronted by small residential subdivisions which could not contribute properly sized recreational facilities but whose presence still generated need, by industrial subdivisions which caused environmental needs not within the category of assessment soluble problems, and by the inability to equate the cost of the exaction with the benefit to or need created by the development being accessed (see Costonis, *id.*, at p 111; cf. *French Investing Co. v City of New York*, 39 NY2d 587, 599, *supra)*.

As a result of these difficulties, another approach was generated. That approach, the "Rational Nexus Test" *(Longridge Bldrs. v Planning Bd. of Twp. of Princeton,* 52 NJ 348) is also asserted by the petitioners. This test draws support not only from the Special Assessment Doctrine in focusing on the benefits accruing to the assessed property, but also from the police power in allowing conditions based on future oriented planning *(Wald Corp. v Metropolitan Dade County,* 338 So 2d 863 [Fla]). Thus, a subdivider can "be compelled only to bear that portion of the cost which bears a rational nexus to the needs created by, and benefits conferred upon, the subdivision" *(Longridge Bldrs. v Planning Bd. of Twp. of Princeton, supra,* p 350; see, also, *181 Inc. v Salem County Planning Bd.,* 133 NJ Super 350, 356-359, mod 140 NJ Super 247).

The rational nexus test relieves the highly constricting uniqueness factor and allows some incidental benefit to the general public. However, alternatively it increases the problems inherent in the cost-benefit analysis justifying the apportioned assessment (see, e.g., *Divan Bldrs. v Planning Bd. of Twp. of Wayne,* 66 NJ 582). Application of either of the foregoing tests would be extremely difficult in view of the population in the New York metropolitan area. Here every private significant improvement or development action has some public cost. Apportionment problems would be overwhelming.

However, petitioners have ignored another standard, the reasonable relationship test, which is justified solely under the police power. The standard was enunciated in *Ayres v City Council of City of Los Angeles* (34 Cal 2d 31). The court in *Ayres (supra,* p 37) concluded that the imposed dedication conditions "are reasonably required by the subdivision type and use as related to the character of local and neighborhood planning and traffic conditions." Since the police power is directed towards upholding the general welfare, an exaction condition is not defeated by incidental benefit to the general public provided that the proposed development is a contributing factor to the problem sought to be alleviated *(Associated Home Bldrs. of Greater East Bay v City of Walnut Creek,* 4 Cal 3d 633). Since the test is un-

qualifiedly flexible, it can be applied to newly identified problems whose solutions are not capable of exact apportionment. Undue cost burdens will be stricken under the standard discriminatory and confiscatory challenges.

The petitioners have asserted tests which emphasize the special assessment doctrine under the mistaken impression that New York has provided no indication as to the standard against which conditions imposed on development are to be measured. However, in *Jenad, Inc. v Village of Scarsdale* (18 NY2d 78), the Court of Appeals confronted a fee in lieu of dedication requirement which was imposed by the village as a prerequisite of subdivision plat approval. The challengers asserted that the fee was an unconstitutional and unauthorized "tax" for general governmental purposes which was being charged against the development. This argument was based on the special assessment doctrine and was rejected by the court (p 84) : "We think that this labeling distorts the purpose and meaning of the requirements. This is not a tax at all but a reasonable form of village planning for the general community good."

*Jenad* strongly emphasizes a police power rationale, allowing a condition with community wide benefits to be imposed on a property so long as there is a reasonable connection between the problem and the application concerning the property. (Cf. *Matter of Concordia Coll. Inst. v Duke*, 29 AD2d 989.) This was not the first time that the police power justification has been asserted on behalf of dedication requirements. In *Matter of Brous v Smith* (304 NY 164), a street construction requirement was upheld as being in the public interest.

*Jenad*, however, has been the source of much confusion and commentary. It cites with approval both *Jordan v Village of Menomonee Falls* (28 Wis 2d 608), which upheld a reasonable relationship test, and *Billings Props. v Yellowstone County* (144 Mont 25), which seems to apply a specifically related test. However, the apparent discrepancy can be explained. In *Billings Props.* the court applied a police power analysis to a statute written under a special assessment rationale. In any event, *Jenad* strongly indicates that a police power reasonable relationship test should be applied

when scrutinizing the condition with respect to its effects upon the application for proposed development, and this court so holds.

Applying this analysis to the condition imposed and the concept upon which it is based, I find a reasonable relationship between the problem that would result from the effectuation of the application's proposed development and the conditional solution designed to alleviate it. As the consultant implied, absent a total relocation and reconstruction of King Street, there are no total solutions to the problem of traffic congestion. The concept adopted by the planning board is only a partial solution which will relieve some of the existing and projected congestion. This goal is to be accomplished in two ways: first, by reducing unnecessary curb cuts and thereby decreasing the number of time consuming turns; and second, by diverting multiple stop traffic through the parking lots and thereby improving the traffic flow on King Street. Thus it is clear that the conceptual solution is reasonably related to the problem.

The petitioners have focused only on the existing problem. They have argued that they are being required to provide a solution for a problem which they have not created and that therefore the condition is arbitrary. This argument ignores the dual nature of the problem with its present and future dimensions. It relies only on the numerous reasons for the existing problems. This reliance is ironic considering that two of those reasons are that the petitioners' driveway is in a poor location and the petitioners' offices attract patrons. However, these factors may not constitute the justification for the imposition of the condition. Existing causes of the problem and the responsibilities for those causes are not the bases for the condition. The fact that the condition will help to alleviate the existing level of congestion is irrelevant, as is the fact that the condition will probably benefit the petitioners as well as the general public. I am not utilizing a special assessment analysis to evaluate the relationship connecting the condition and the problem.

The conditional solution imposed on the petitioners is related solely to an assumption that exacerbation of the congestion problem will result from the further develop-

ment of the petitioners' property. That assumption is clearly reasonable and should be upheld. (See *Matter of Golden v Planning Bd. of Town of Ramapo*, 30 NY2d 359; cf. *181 Inc. v Salem County Planning Bd.*, 133 NJ Super 350, *supra.*)

The logic of such an assumption was presumed by all the participants in the board's hearings without the submission of numerical projections. Figures were not necessary. Numerical correlations evidencing the assumption had already been made to support the town regulations directly proportioning the number of parking spaces to the amount of building space occupied by a given business (see Town Code, § 60-426.3).

Before concluding this discussion, I must note that the application of the reasonable relationship test is essentially factual and that the resolution of the issue will vary directly with the circumstances of each particular case (see *Maher v City of New Orleans*, 516 F2d 1051, 1059). I do not mean to imply that an unreasonable relationship would occur where the interaction of an application with an existing problem requires that a full solution be provided by the applicant. I hold merely that on these facts, conditioning approval of the petitioners' application on the petitioners' consent to a reasonable share of the solution designed to alleviate the exacerbation of the problem, is not arbitrary.

### THE SOLUTION AS DISCRIMINATORY

Although the petitioners have not argued that the condition or concept is discriminatory, I am of the opinion that the issue requires comment. Ordinarily an allegation of discrimination is made when a property is burdened by restrictions and other properties similarly situated are not. (1 Rathkopf, Law of Zoning and Planning [4th ed], §8.01, p 8-4, n 7.) Here the concept as designed includes all properties on King Street which appear to be similarly situated.

I use the term "appear" deliberately. The properties which immediately adjoin the properties encompassed by the plan have not been included and no explanation has been provided for this omission. I am aware that the equal protection requirement of being similarly situated in a plan-

ning context includes a much broader range of factors which potentially differentiate properties than in a zoning context; and that therefore reasonable distinctions are easily made with respect to the former. Nevertheless, I am disturbed by the failure of the planning board to articulate any rationale in this instance.

Specifically, I do not understand why the next three properties on the northeast border of the plan have not been included in the limited goal plan. The first two of those properties are owned by a single owner and are serviced by a single driveway pursuant to an earlier determination of the board. The third is the last property with a curb cut on King Street before the intersection of Maple Avenue.

Presumably, the planning criteria are the same for the lower section of the upper half of the King Street "S" curve as they are for the center section. The grade exceeds maximum, and the properties are directly opposite an awkward intersection which generates as many accidents as the intersection opposite the petitioners' property. Moreover these three properties are located within the same district with a business retail designation as those encompassed by the plan. Simply put, there appears to be no obvious reason for the failure of the board to include these properties in the plan. Thus, articulation of the consultant's underlying assumptions for such omission seems necessary.

In the same vein, I fail to comprehend why petitioners' adjoining property, upon which a driveway was eliminated in 1971, has not been included in a plan purporting to be a co-ordinated solution for traffic circulation and access and for parking problems. Presumably the elimination of that driveway in 1971 was reasonable because the curb cut and parking area located on the property of petitioners, which is the subject of this appeal, was capable of serving both properties. Accordingly, the plan must recognize the overlapping functions of the adjoining properties in order to be considered a valid planning exercise.

I recognize, of course, that the planning relationships between the properties encompassed by the plan may not change after consideration. Nevertheless, consideration

must be given and the underlying assumptions of the plan must be articulated to enable this court to determine the reasonableness of the plan and the conditions imposed to implement it. (See *Friends of the Earth v United States Environmental Protection Agency*, 499 F2d 1118, 1123.)

I also find it necessary to note that the concept is designed to be internally consistent and nondiscriminatory. Each property is burdened to the same degree but not in the same manner. If a driveway has been designated a common access, it is shared. If not, it is eliminated. Thus, upon execution of the plan each property will be serviced by two access drives connected by circulation aisles running through all of the properties.

Although the burdens created by the plan are roughly equivalent, the benefits have not been distributed as evenly. Dr. Brosgol has received, virtually without cost, a valuable means of access enabling him to develop his property fully. The petitioners, in contrast, have received only incidental advantage from the reduction of congestion. This inequity does not defeat the consultant's concept. Uniformity of advantages is not required if the measure is designed to produce widespread public benefit in which all can share *(Penn Cent. Transp. Co. v New York City*, 438 US 104, 133-135, affg 42 NY2d 324; *Wine v Boyar*, 220 Cal App 2d 375; accord *Miller v Schoene*, 276 US 272).

Nevertheless, the board could be accused of implementing the plan in a discriminatory manner since approval of Dr. Brosgol's site plan was conditioned on his consent to what basically constitutes partial implementation, i.e., reciprocal access easements with the petitioners. On the other hand the petitioners' approval is conditioned on their consent to full implementation, i.e., reciprocal access easements with all the property owners encompassed by the plan. I attribute this discrepancy to the board's confusion as to its final goal upon its application of the solution. The mistake is not irrevocable, however, and calls for no remedial action on appeal. The rear portion of Dr. Brosgol's property is as yet undeveloped. Prior to any further development, Dr. Brosgol must again seek board approval. At that time, the board can remedy the inequitable situation which now exists by

conditioning its approval on Dr. Brosgol's consent to full implementation.

## THE SOLUTION AS CONFISCATORY

The petitioners' main contention on appeal is that the condition effects a taking without due process of law and that therefore they are entitled to just compensation.

Initially it should be noted that in the past, in situations concerning strictly proportioned conditional exactions required by statutes, such arguments were met with the rationale that since the application which triggered the need was totally voluntary, no taking could be attributed to the government since it had not required the exaction independently of the application (see *Matter of Brous v Smith*, 304 NY 164, *supra*). However, this rationale does not apply in a nonstatutory context where there is no presumption of reasonableness. In such a situation a determination as to the nonconfiscatory nature of the condition must be made (see *East Neck Estates v Luchsinger*, 61 Misc 2d 619), and each case in such a situation turns on its facts *(Berman v Parker*, 348 US 26, 32).

"Taking" challenges arising in varied factual settings have been the source of considerable litigation in this State. In *French Investing Co. v City of New York* (39 NY2d 587, 593, 594, *supra*), the "taking" metaphor for constitutional overregulation was abandoned in favor of due process analysis (see, also, *Modjeska Sign Studios v Berle*, 43 NY2d 468, 474). Thus, in this instance, the petitioners in no event would be entitled to just compensation on the grounds that a "taking" had or would occur as a result of the planning board's adoption of the King Street Hill Area Site Plan. If there is an ultimate determination of overregulation, the petitioners will receive merely a declaration of invalidity as to such limited goal plan.

There is no set legal formula for resolution of these issues since each case must be determined on its facts. (See *Penn Cent. Transp. Co. v New York City*, 438 US 104, 124, *supra.)* Nevertheless, certain principles must be applied and certain factors identified and evaluated. Specifically, the restriction on a property interest must be considered in the

context of the property as a whole *(Penn Cent. Transp. Co. v New York City, supra,* p 130). In each case it is necessary to isolate the nature of the government action, define its character, and evaluate its purpose. Finally, it is essential that the economic impact on the property be measured by focusing the inquiry on the extent that the government regulation interferes with investment backed expectations *(Penn Cent. Transp. Co. v New York City, supra,* pp 123-128; see, also, *Penn Cent. Transp. Co. v City of New York,* 42 NY2d 324, *supra).*

Analysis of the issue of confiscatoriness is complicated on this appeal by the lack of specific implementation strategies incorporated in the King Street Hill Area Site Plan. Thus it is necessary initially to evaluate the concept and thereafter to identify the constitutional implications of the various strategies available to the board.

On appeal the requirements of the condition have been the source of conflicting characterizations by the parties. These conflicts result partially from the parties' failure to clarify the condition after Special Term indicated that the condition was vague during the first judicial review.

The petitioners contend that to satisfy the condition they must allow a public road to run through their property. They maintain that the board's undisclosed purpose in requiring the road is ultimately to connect it to a town held easement running diagonally from Maple Avenue to the plan border. The board argues that the plan calls only for cross connections between parking lots and emphasizes that only the petitioners' consent is presently necessary.

The designations of the parties and the focus of their arguments are inaccurate. As initially acknowledged during the early board hearings, the plan requires that the petitioners consent to a common access easement. Upon their acquiescence, their property would be burdened by the subject easement *eo instanti.*

Although not as onerous a burden as the petitioners contend, this is a substantial condition. The condition is required for the benefit of the public but for use only by the other property owners encompassed by the plan and their

patrons and customers. It is not quite clear who is to own or maintain the easement. Nevertheless it is sufficient for the evaluation of the concept to know that title is not in the town. With respect to the board's hidden aims, it is sufficient to note that the town's good faith is assumed. (See *Matter of Golden v Planning Bd. of Town of Ramapo*, 30 NY2d 359, 373, n 7, *supra.*) If in the future the town desires to improve its business district with a street which would utilize the portion of petitioners' property affected by the King Street Hill Area Site Plan, then the petitioners could bring another proceeding.

The common access concept is a hybrid condition with complementary functions. Its intended goal is to prevent additional traffic congestion. However, it also provides incidentally a remedy for the design defects in King Street. Thus, while it prevents a future nuisance, it also incidentally provides an amenity. The reason for the imposition of the condition is public safety, a significant governmental concern. (See *Modjeska Sign Studios v Berle*, 43 NY2d 468, 478, *supra.*)

Generally, when a government entity acts to prevent a nuisance, it acts in its arbitral capacity, that is, its capacity to resolve land use conflicts, and its actions result in noncompensable regulation *(Lutheran Church in Amer. v City of New York*, 35 NY2d 121, 129). The general case, however, involves conflicts between private citizens. Here, the conflict occurs between the petitioners and the public. This distinction does not necessarily foreclose a determination that the board has imposed a constitutionally proper restriction, for the public also has rights (see *Erie R. R. Co. v Public Utility Comrs.*, 254 US 394, 410-411; see, generally, *State v Dexter*, 32 Wn 2d 551, affd 338 US 863; Sax, Takings, Private Property and Public Rights, 81 Yale LJ 149, 155-161).

Since the public has rights, the board may require that the patrons of the businesses encompassed by the plan, enter the plan area at a limited number of access points and travel the internal circulation aisle in order to preserve in an uncongested state, a common resource upon which depends the economic welfare of the entire business district. The board

is not acting in its enterprise capacity in upholding the public's rights. It has not taken private resources unto itself for the common good (see *Lutheran Church in Amer. v City of New York, supra,* p 129). Here, title remains in the petitioners and/or the other property owners.

The plan neither facilitates nor arises from the entrepreneurial operations of the Town of New Castle. The incidental remedial effect of the condition cannot be made a basis for finding that the plan exploits the petitioners' property for town purposes. (See, generally, *Penn Cent. Transp. Co. v New York City,* 438 US 104, 135, *supra.*)

The condition requires that petitioners allow noncustomers to travel across their property and implies a duty to maintain the access route. However, the latter obligation has not yet been articulated. The planning board's exercise of the police power therefore differs from the norm in zoning cases. The property is affirmatively burdened rather than negatively restricted. This distinction is noted by the petitioners. However, it provides no support for their confiscation argument. The theory of positive duties placed upon properties has been upheld. *(Penn Cent. Transp. Co. v City of New York,* 42 NY2d 324, affd 438 US 104, *supra; Maher v City of New Orleans,* 516 F2d 1051, *supra.)*

Under the condition imposed herein the petitioners have not been deprived of all reasonable use of their property for business purposes. In fact, the use of the property has not changed at all.

I have noted that the board's condition provides an amenity as well as prevents a nuisance. This refinement becomes important in considering the economic impact of the condition on the property as a whole. Traditionally if the purpose supporting the government interference with private property rights was the creation of an amenity, then much less diminution in property value or use was tolerated. (See Comment, 78 Col L Rev 134, 148; see, e.g., *Morris County Land Improvement Co. v Township of Parsippany-Troy Hills,* 40 NJ 539; *Vernon Park Realty v City of Mount Vernon,* 307 NY 493.)

However, the interference with petitioners' constitutional rights by the board's requirements would occur only if the

diminution in the property's value or use resulted in no reasonable return to the property owner. (See *Penn Cent. Transp. Co. v City of New York*, 42 NY2d 324, 336, *supra.*) The computation of this return is made on such factual elements[8] as: the permissible uses of the property, which in this case have not changed; compensatory substitute rights as an accommodation, for example, the reciprocal easement across adjoining properties and the second access; and any incidental benefits accruing from the government action, that is, less congestion and possibly more parking spaces (see Costonis, The Disparity Issue: A Context for the *Grand Central Terminal* Decision, 91 Harv. L Rev 402).

Thus it is clear that conceptually the condition imposed by the board is not inherently confiscatory. The burdened property is capable of a reasonable return and no evidence has been presented by the petitioners to contradict this conclusion. However, the petitioners' failure to meet their burden does not result in a victory for the board (see *Spears v Berle*, 48 NY2d 254, 263). The concept of the consultant does not specify the means by which the intended result of the plan is to be achieved. This default provides a valid excuse for the petitioners' failures and also defeats the plan.

More specifically, I am concerned with the board's failure to identify and articulate the implementation strategies or to recognize the basic conflicts with constitutional implications inherent in the various choices. For example, the other properties encompassed by the plan are in various stages of development. The potential flow of traffic through the petitioners' property cannot be precisely quantified. If a number of high traffic generation uses are permitted to be developed, there is a significant possibility that the petitioners' present business will decline. That is so because the parking that the petitioners have provided is perpendicular

---

8. In *Penn Cent. Transp. Co. v New York* (42 NY2d 324, *supra*), Chief Judge Breitel stated that it was not constitutionally required to compute reasonable return on that portion of the value contributed by government and society. We believe that in the ordinary case where there is no evidence of subsidies specifically designated for the property or owner, the social increment theory *should* not be applied. (For discussion, see Comment, 78 Col L Rev 134, 155-162; Costonis, The Disparity Issue: A Context for the *Grand Central Terminal* Decision, 91 Harv L Rev 402, 415-418.)

to the access and heavy traffic will not allow for backing or turning movements. Thus, the concept of the consultant could have the unintended effect of destroying the present use of the property. Such a result would have similar constitutional ramifications as those that occurred in *United States v Lynah* (188 US 445), where government attempts to improve navigation caused land to become flooded and valueless. (Accord *Griggs v Allegheny County*, 369 US 84; *United States v Causby*, 328 US 256; *Portsmouth Co. v United States*, 260 US 327.)

Another example of potential unresolved conflict bearing on the confiscatoriness of the condition, is contained in the regulations requiring parking spaces in relation to the amount of floor space. The condition imposed by the board necessitates that the petitioners convert a number of parking spaces as yet unspecified into the circulation aisle at the point of cross connection. The petitioners' property contains both an office building and a fully functional but nonoperational restaurant.[9] If the loss of spaces results in a prohibition against the use of either of these two facilities, investment backed expectations have been frustrated (see *Penn Cent. Transp. Co. v New York City*, 438 US 104, 124, *supra*). This potential diminution in use is foreseeable if not predictable. If it did occur as a direct result of the present limited goal plan coming into existence, a reduction in the petitioners' return on investment would undoubtedly occur. Such a possibility could well render the King Street Hill Area Site Plan unconstitutional as it is presently designed.

### THE SOLUTION AS VAGUE

It is clear that the board, in its desire for flexibility, has not considered the potential conflicts which not only might render the plan constitutionally defective but which will also render the plan incapable of effectuation (see, e.g.,

---

9. The record contains no facts concerning this restaurant. I am aware of its existence only because Special Term made a passing reference to it in its decision upon the first judicial review. The comment indicates that the petitioners closed the restaurant. The petitioners should be cautious. The Constitution protects existing uses, not intentions. (See *Morris County Land Improvement Co. v Township of Parsippany-Troy Hills*, 40 NJ 539, 550-551, *supra*.)

*Uelner Precision Tools & Dies v City of Dubuque*, 190 NW2d 465 [Iowa]). For instance, when the petitioners protested the potential loss of parking spaces, the board chairman assured them that any loss would be made up on Dr. Brosgol's property. However, nowhere in the condition upon which approval of Dr. Brosgol's application was granted, is there language either setting forth or implying that the Brosgol property would be so burdened.

Maintaining flexibility is a required feature in long range comprehensive plans. In this case we are dealing with a limited goal plan to be executed in the foreseeable future. Therefore the concept of the consultant should have been fairly precise in its implications for action. (See Mandelker, The Role of the Local Comprehensive Plan in Land Use Regulation, 74 Mich L Rev 900, 918.) Instead the degree of specificity is inversely related to the scope of the King Street Hill Area Site Plan.

But flexibility and specificity are not mutually exclusive. There are devices which can be utilized to insure flexibility over time. The consultant can project and articulate factors subject to change significantly, develop contingency strategies for major changes and correlate triggering factors. Moreover, the board has the power to amend, although this choice should be used with reservation. Significant amendments could provoke further litigation by the petitioners and others bound or benefited by the plan.

The board must identify potential conflicts and assemble strategies that will achieve results. Its members must prepare a definite statement of methods chosen and methods rejected. In short, the board must develop an implementation plan. "The implementation plan assumes that the basic objectives, which are usually within a narrow range, are agreed upon, and the major planning task is to select the array of approaches necessary to achieve those objectives." (Brooks, The Law of Plan Implementation in the United States, 16 Urban L Ann 225, 231-232; see, also, Mandelker, 74 Mich L Rev 900, 918-920, *supra.*)

Throughout this decision I have identified elements in need of clarification. There are many more potential points of conflict in the consultant's concept. For example who is to maintain the easement? Is it to have properties normally

associated with common easements? Who can enforce the plan? How is notice to the public to be achieved? What are the criteria for full and partial implementation? What conditions would necessitate termination of the plan? What procedures for review and amendment are necessary?

I understand the dangers of rigidity in a concept whose implementation is effected over time. Yet the implementation plan need not be rigid. There is no requirement in this holding that the plan be particularized in minute detail. For example, there is no need to lay out the circulation aisle. Nevertheless the plan must be reasonably specific in its implications for action. It must be complete and internally consistent (see Brooks, 16 Urban L Ann 225, 239; see, also, *Matter of Golden v Planning Bd. of Town of Ramapo*, 30 NY2d 359, *supra*).

Thus, in projecting the traffic flow across the properties to protect them from unintended confiscatory effects, it would be sufficient to establish the highest parameters of traffic flow permissible and thereafter process use and development applications accordingly. It would equally be sufficient to identify high traffic uses and prohibit their presence within the four corners of the plan. With respect to the potential problem concerning the loss of parking spaces, the board also has several options. It could reduce the number of spaces required for the uses on the petitioners' property or it could consider the total number of spaces within the plan boundaries to determine if, *in toto*, the area contains sufficient parking to satisfy the local ordinance. (See Town Code, §§ 60-426.3, 60-426.4.)

The crucial factor is the board's awareness of the potential conflicts and its commitment to expeditiously resolve them. The entire history of the applications in this case demonstrate the board's confusion with its function and ultimate purpose. Essentially the applicants were asked to negotiate implementation strategies between themselves. These demands resulted in further confusion and unnecessary delay. The applicants did not have the expertise necessary to develop these solutions. At best, the applicants could offer suggestions but they should not be required to develop implementation strategies in order to secure approval of their applications. Accordingly, I must emphasize that it

is the board's responsibility to complete the plan, if the board chooses to continue on this course.

Again, I do not imply or propose a specific formula for the problems inherent in the consultant concept since members of this court are not planners *(Berenson v Town of New Castle,* 38 NY2d 102, 111, *supra).* The plan is inadequate and must be rejected in its present formulation (cf. *Friends of the Earth v Carey,* 535 F2d 165; *Friends of the Earth v United States Environmental Protection Agency,* 499 F2d 1118, *supra).*

Because the plan is inadequate, the condition based thereon is vague and must also be stricken. Conditions must be certain and unambiguous *(Suburban Club of Larkfield v Town of Huntington,* 57 Misc 2d 1051, affd 31 AD2d 718; Samuels, Conditions in Planning Permission, 118 Solicitor's J 765). Conditions are binding contracts *(Matter of Flushing Prop. Owners Assn. v Planning Comm. of City of N. Y.,* 43 AD2d 515). It would be grossly unfair to require petitioners to consent to a common access easement when the implications of their consent are unknown and potentially unconstitutional.

Therefore, the judgment of Special Term should be reversed and the matter remanded to the planning board for further action in accordance with this opinion.

MOLLEN, P.J. (dissenting).

While I am in agreement with many of the conclusions contained in the comprehensive and excellent opinion of my distinguished colleague, nevertheless I am compelled to dissent and would affirm the judgment of Special Term. As I perceive the issue before this court, it is solely the question of the reasonableness of the condition imposed by the respondent planning board in its approval of the site plan submitted by appellants.

I agree with the majority that (1) the planning board had the authority to approve appellants' site plan conditionally, (2) traffic congestion is related to public health, safety and welfare and is a mandated subject for the planning board's consideration, (3) the action of the planning board, in imposing a condition with the limited goal of elim-

inating curb cuts in order to reduce traffic congestion and increase safety on the road, was well within the parameters of authority delegated to the planning board by the town, (4) the preparation and adoption of a limited goal plan on the basis of the evidence presented was consistent with the comprehensive plan and compatible with the regional and State planning goals, (5) there is a reasonable relationship between the problem that would result from the effectuation of the proposed development and the imposition of the conditional solution designed to alleviate the problem, and (6) conceptually, the condition imposed by the planning board is not inherently confiscatory.

In view of the foregoing I conclude, as did Special Term, that the condition imposed was a reasonable exercise of the planning board's authority and in furtherance of public health, safety and welfare.

I would note that appellants did not raise the issue to which the majority addresses itself, namely, lack of specificity in the limited goal plan. The impact of the majority's decision will be to impose a mandate at this time upon the town to more fully particularize a plan for future implementation which it is apparently not prepared to do at the present time, and which is unnecessary with regard to the present application. Insofar as the appellants are concerned, the result will be to further prolong the delay, in all likelihood for a lengthy period, of the approval of its proposed site plan.

As indicated above, the majority and I are in agreement that concern for the traffic congestion problem is a valid concern of the planning board; the condition here imposed is a reasonable step towards solving that problem.

For the foregoing reason I dissent and vote to affirm.

HOPKINS and MANGANO, JJ., concur with TITONE, J; MOLLEN, P.J., dissents and votes to affirm the judgment, with an opinion.

Judgment of the Supreme Court, Westchester County, dated February 28, 1978, reversed, on the law, without costs or disbursements, and matter remitted to the Planning Board of the Town of New Castle for further proceedings in accordance with the opinion herein.